ANNA E. MacEWEN, Plaintiff, *v.* THE CITY OF NEW ROCHELLE
and Another, Defendants.

Supreme Court, Westchester County, September 30, 1933.

*J. Henry Esser* [*Abraham Rosenburg* on the brief], for the plaintiff.

*Patrick J. Rooney, Corporation Counsel,* for the defendant The City of New Rochelle.

*William A. Davidson, County Attorney [Francis J. Morgan, Deputy,* of counsel], for the defendant The County of Westchester.

TAYLOR, GEORGE H., JR., J. In this action plaintiff seeks a declaratory judgment. (Civ. Prac. Act, § 473.) The form of action was suggested as proper by our Appellate Division in *Matter of County of Westchester (MacEwen)* (237 App. Div. 833), citing *Dowsey* v. *Village of Kensington* (257 N. Y. 221, 225). Her former property in the city of New Rochelle is now of the defendant county of Westchester as the result of the exercise by the latter of the power of eminent domain (*Matter of County of Westchester [MacEwen], supra*). At the time when title vested in the defendant county, September 27, 1929, the said property was located in a district zoned in a presumptively valid way according to the relevant ordinance of the defendant city effective June 13, 1929, as residence A (single-family detached dwellings). This circumstance on its face prevented the use of plaintiff's said then property for apartment (multi-family) purposes, and as far as residential use was concerned limited the same to single-family detached dwellings. The defendant county on August 10, 1929, by the Westchester county park commission (Laws of 1922, chap. 292, and subsequent acts amendatory thereof, and supplemental thereto), instituted said condemnation proceeding to acquire lands for parkway purposes, including plaintiff's then property, which upon a map entitled " Westchester County Park Commission Map of Lands to be acquired for the Cross County Parkway, Westchester County, N. Y.," filed in the office of the clerk of Westchester county July 30, 1929, as Map No. 409 (Register's No. 3360), was designated as parcel 13, sheet 10. On September 17, 1929, judgment of condemnation was duly rendered which *inter alia* appointed commissioners of appraisal. These qualified and entered upon the discharge of their duties. Subsequently they filed a report containing their appraisal, and later on September 1, 1931, they rendered a supplemental report and memorandum both of which were filed on September 3, 1931. From said reports and memorandum it appears that they fixed the value of the property as of the relevant date, September 27, 1929, at the sum of $30,000, and that the commissioners did this assuming the validity of the zoning ordinance (thus presumptively valid), which thus classified in a restricting way the plaintiff's former property as residence A. They intimated, however, that if it were found that the said ordinance was void in so far as such classification affected the said property of the

plaintiff, restricting it to single-family detached dwellings and forbidding its use as an apartment site, the property would have a value greater than $30,000. The plaintiff asserts and has offered evidence that such greater value (in the event of the invalidity of the ordinance being declared), would be a sum upwards of $53,000 as of the relevant date. The commissioners also reported, and in my opinion with sufficient reason, that the highest available use of said property was for apartment purposes. It was located in what was essentially — except for the Calton Court apartment, mentioned *infra* — a residential district devoted to single-family detached dwellings, and if plaintiff's property was available for an apartment, of course, it would be more than desirable for that purpose, in view of its surroundings. An order of Special Term was made January 9, 1932, in the condemnation proceeding (the writer presiding). This directed *inter alia* joinder of the defendant city in that proceeding and a trial therein of the validity of the zoning ordinance in so far as it affected plaintiff's said (former) property. That order I am now convinced represented a departure not only from the usual but also from the proper practice, and in my present opinion the subsequent reversal thereof (237 App. Div. 833, *supra*), on the ground of error in that suggestion, was in order; and, as I now think, was to be expected. The erroneous suggestion was made for the purpose of providing a definitely proper basis for an appraisal and for the fixing of the lawful compensation to be paid to plaintiff by the county for the relevant property, particularly in the event that the zoning ordinance was found to be invalid to the extent suggested by the plaintiff as far as her rights and property were concerned. This action in the form suggested by the Appellate Division is the proper vehicle for the determination of plaintiff's alleged rights. In the complaint the plaintiff in effect asserts that as of the relevant date (September 27, 1929) the New Rochelle zoning ordinance, although presumptively valid, (1) was not supported by any delegation of power to the municipality from the Legislature to enact the same; (2) was arbitrary, discriminatory and unreasonable; (3) deprived plaintiff of her property without due process of law; (4) was in violation of both State and Federal Constitutions, and (5) was null and void, in so far as it assumed to place the plaintiff's said (former) property in a residence A district, thereby in effect forbidding the use thereof for an apartment or multi-family house and confining such (residential) use to single-family detached dwellings. Plaintiff contends (a) that the use regulations, district lines and classifications in said ordinance, a part of which is the relevant zoning map, were not made in accordance with or as a

reasonable part of a comprehensive plan to promote the public health, safety and general welfare of the community, and *were* made without reasonable consideration of the character of the district, its peculiar suitability for a particular use, the conservation of property values including that of the relevant property of plaintiff, and the direction of building development, in accordance with a well-considered plan; and (b) that the regulations to the extent that plaintiff complains of them, were not designed to secure safety from fire or other dangers, nor to enhance the value of land throughout the city, nor for any purpose for which the city had power to enact such an ordinance.

Both defendants controvert the material allegations of fact upon which the plaintiff claims the invalidity of the zoning ordinance, dispute plaintiff's conclusions as above asserted, and contend that the ordinance, presumptively valid, is actually a lawful exercise of power resident in the city by delegation from the State (General City Law, § 20, subds. 24 and 25), in so far as it affected and restricted the use of the relevant property (formerly of plaintiff). The defendant county contends also that it is neither a necessary nor proper party. I overrule that contention *in limine*, for the reason that a complete and effective determination of plaintiff's rights, the property having been condemned and her right (originally in the fee of the property) having been transferred to the eventual award, could not be made herein in the absence of the defendant county (Civ. Prac. Act, § 193), which, in the event of plaintiff's success in this action, might be called upon, as the ultimate result of the condemnation proceeding, to pay an award greater than $30,000. The able counsel for that defendant contends also that the plaintiff waived her right to question the claimed invalid ordinance because she waited for several years before suing to test its validity. This contention, however, is groundless. No statute of limitations (See Civ. Prac. Act, § 53) is a bar to the action, or even pleaded, and there are no facts working an estoppel against the plaintiff precluding the present test; and viewing the ordinance for the moment as invalid, I think a fair argument may be made that until its repeal or a judicial declaration of its invalidity, the same constitutes at least the equivalent of a continuing invasion of plaintiff's property rights akin to a continuing trespass — a situation in which a new cause of action arises in plaintiff's favor against the defendant city each day. (For principle see *Silsby Manufacturing Co.* v. *State*, 104 N. Y. 562, 569; *Dowsey Case*, *supra*, at p. 228.) As indicated, this last suggestion is based upon the assumed invalidity of the ordinance. The plaintiff is entitled to maintain this action. The contentions to the contrary referred

to, and others not by me discussed, are not efficient to preclude her from maintaining it. Her former right in the property is now represented by her right to just compensation by virtue of an award, which latter, undoubtedly, would be greater in amount if the ordinance should be found to be invalid in the respects claimed by her. The question to be determined is whether upon the relevant facts either conceded, or established by the greater weight of the evidence, the questioned ordinance, in so far as it affects plaintiff's said (former) property to the extent which causes her to complain of its provisions, is a valid exercise by the defendant city of power duly delegated to it. After careful consideration of the proofs and excellent briefs, I determine that said ordinance was valid on September 27, 1929 (the date when title vested and as of which the commissioner's appraisal of value must be made), and that judgment should be entered so declaring and dismissing the complaint upon the merits. For this determination I assign the following reasons related (1) to the law and (2) to the facts:

(a) The delegation of power is found in the General City Law, section 20, subdivisions 24 and 25. It is not doubtful that the zoning authorities had power thereunder to establish residential districts, and from this it follows that they " had the power to make such classification really effective by adopting such regulations as would be conducive to the welfare, health and safety of those desiring to live in such a district and enjoy the benefits thereof as we ordinarily conceive them. Outside of large cities where more or less congestion is inevitable, we ordinarily think of a *residential* [italics mine] district as devoted to private homes rather than to large commercial buildings. * * * The primary purpose of such a district is safe, healthful and comfortable family life rather than the development of commercial instincts and the pursuit of pecuniary profits." (From *Matter of Wulfsohn* v. *Burden,* 241 N. Y. 288, 300, 301.) The same authority makes it clear that the ordaining power, the common council, has the right in a residential district, to promote the purposes mentioned, and to protect people desiring to enjoy those conditions *by excluding apartments or multifamily houses* from the given district. (*Wulfsohn Case, supra,* and relevant cases of this and other jurisdictions cited therein.) The argument that if otherwise valid such an ordinance depreciates the value of plaintiff's (former) property is not an effective one against its validity. (Id., citing *Spector* v. *Building Inspector*, 250 Mass. 63, 70.)

The plaintiff's brief expressly does not challenge the established law which upholds the right of a municipality to establish private residential use districts from which apartment houses are excluded;

plaintiff's counsel cites in this connection the *Wulfsohn Case* (*supra*); *Welch* v. *Swasey* (214 U. S. 91); *Village of Euclid* v. *Ambler Realty Co.* (272 id. 365). Apparently he suggests that the area including the plaintiff's (former) property, which area is adjacent to and west of North avenue, a wide street with considerable, and in a degree increasing, vehicular traffic, was zoned originally (June 13, 1929) by the defendant city, in a way which was "more or less tentative," pending some complaint of unreasonableness by a property owner in that area. Counsel says that he does "not criticize the planner who included the North Avenue frontage tentatively in this area, because he knew that zoning ordinances are always subject to change when proper considerations therefor arise, or they can be nullified by the Court." He refers in this connection to General City Law (Art. 5-A, §§ 81 and 83); *Matter of Eaton* v. *Sweeney* (257 N. Y. 176); *People ex rel. St. Albans-Springfield Corporation* v. *Connell* (Id. 73) and *Prescott* v. *Pierce* (130 Misc. 63), as supporting his said statement. He further states in effect as to the MacEwen parcel, that the time for more definite zoning regulations in the relevant area "*is now here*," meaning, undoubtedly, September 27, 1929. It would seem, therefore, that plaintiff's counsel practically concedes what I find from all the relevant evidence to be true, that as to plaintiff's (former) property and the immediate area in which it is located, including the North avenue easterly frontage of that area, the ordinance was not vulnerable as of the date (June 13, 1929) of its adoption to successful attack in the respects in which plaintiff now objects to it; but that changes in the locality later made it thus vulnerable. I am of opinion, however, that the ordinance was never thus vulnerable between the date of its adoption and the date when title vested in the county. I express this opinion after considering (the notion of) an apartment building upon plaintiff's property as of that relevant date and as of the said anterior period, "not by an abstract consideration of" such apartment building, or the same "considered apart," but "by considering it in connection with the circumstances and the locality." (*Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 388; see further discussion *infra*.)

(b) The district in which the property is located on June 13, 1929, and until and including September 27, 1929, was preponderantly residential in the detached single-family house sense. The ordinance restricting its use in the manner of which plaintiff complains was at the time of its adoption, and continued to be until and including September 27, 1929, when title thus vested, a valid exercise of the delegated police power. The single point made by

the plaintiff challenging such validity is in its application to the plaintiff's property improved with a single-family dwelling, which consideration the plaintiff's brief states " automatically includes the territory to the east, running to North Avenue, bounded as follows: Northerly by Bramer Avenue; easterly by North Avenue; southerly by the New Rochelle public park and westerly by Glenfruin Avenue and the New Rochelle public park. (See Map. Exh. 10)," and the sole claim is that the ordinance forbidding the use of the land in that area for apartment house purposes takes away a substantial portion of its value for no legal reason justifiable by a taking under the police power, without compensation; and is, therefore, beyond the relevant delegation (General City Law, § 20, subds. 24, 25), and unconstitutional, null and void. The said point is not well taken. No facts exist which make it proper for the court in this case to substitute its judgment for that of the common council. (*Zahn* v. *Board of Public Works*, 274 U. S. 325, 328.) In fact also the court agrees with the council in this case. The following determinative facts established by the evidence, or undisputed, have reference to September 27, 1929: The plaintiff's property is improved with a detached single-family dwelling. It was purchased by plaintiff on June 1, 1925. The house was erected a few years before that. The property is situated in a neighborhood which, except for the nearby Calton Court apartment house in the Highland Park development, which apartment house lies at an elevation of about thirty feet higher than the plaintiff's property, is devoted essentially to single-family detached dwellings. Some of these, particularly to the east of North avenue, are of the highest residential class. Plaintiff's property is about 150 feet west of North avenue, a wide and, from Eastchester road north, a beautiful traffic artery extending north and south through the city. Eastchester road is in a direct line south of the plaintiff's property at a distance of about 1,800 feet measured from plaintiff's property across Huguenot Park. Going north from said Eastchester road to what is known as Cooper's corners (the junction of North avenue, Wilmot road and Mill road), about 8,000 feet north of the plaintiff's property, North avenue passes through a territory which in the main is devoted to single-family detached residences. To the east of North avenue are the impressive residential developments of Beechmont, Forest Heights, Broadview, Lyncroft and Wykagyl Park which adjoins the Wykagyl Country Club on the south; and still further north is the similar development of Bonnie Crest. These are all devoted to high class residences. To the west of North avenue, as one proceeds north

from Eastchester road, there is the New Rochelle (Huguenot) park extending north for about 1,800 feet. This practically contains within its westerly portion the structurally beautiful high school and that school's athletic field. The park is landscaped and decorated. It is made even more beautiful by what is now Huguenot lake (formerly Mahlstedt pond), which is divided into two portions by a sort of causeway over which there is the walk which goes west from North avenue to the entrance of the high school. One thus proceeding north on North avenue then passes the area containing the plaintiff's property, such area being improved by one-family detached dwellings; and then comes, in his journey north, to Highland Park improved in the main by detached one-family dwellings; but also characterized by the large Calton Court apartment house referred to, which was erected after a controversy in the court (See *Matter of Calton Court* v. *Switzer*, 221 App. Div. 799) before zoning forbidding improvements of that character became effective. Again proceeding north we find the Rosehill Garden development (formerly Siebrecht property), devoted to high class single-family detached residences, the Seacord property with its old residence and other buildings, the Bon Air Park development, Wykagyl Terrace, Wykagyl Crossways and Northfield, such developments existing in the order stated and all being of the same general high class residential character. The developments previously mentioned as lying on the east side of North avenue extend in some instances for thousands of feet to the east. All extend east for a substantial distance from North avenue. Those mentioned as lying to the west of North avenue extend to and in some instances beyond Webster avenue, which is approximately from 1,500 to 2,000 feet (varying) west from North avenue. The only apartments in the neighborhood of North avenue between Eastchester road on the south and Cooper's corners on the north, are those apartments which are on the south side of Eastchester road, on and west of North avenue, the said Calton Court apartment and Wykagyl Gardens, the latter a series of high class apartment units which lie to the north of the Wykagyl Country Club and are in the immediate vicinity of the New York, Westchester and Boston Railway Company (North Avenue station) — at least 4,000 feet north of plaintiff's property. At said station there is a (not extensive) business (store) development. There are also a few two-family houses (ten or twelve in number) erected before zoning, to the west of the high school and park.

It is urged on behalf of the plaintiff that the increased and increasing traffic on North avenue near the plaintiff's property,

the proximity of Calton Court to that property, the presence of the park, high school and athletic field, the existence of apartments on the south side of Eastchester road, and other circumstances related to the general locality in which plaintiff's property is situated, as well as to the immediate area in which it is located, so affect that area as to make the zoning ordinance unreasonable and void to the extent of which plaintiff complains of it as affecting her property. From all the evidence I find to the contrary and determine that as to said area the zoning ordinance of September 27, 1929, meets every test having reference to valid zoning. To my mind a mere recital of the above detailed facts shows the error of plaintiff's contention; for the neighborhood, considerable in extent, containing the developments mentioned and which includes plaintiff's property, is manifestly so preponderantly residential in the single-family detached house sense, as to make the questioned exercise of the zoning power by the authorities restricting the plaintiff's property to single-family detached dwellings as far as residential use is concerned and excluding apartments therefrom (*Wulfsohn Case, supra*), a valid exercise of that power. This is not a case where an area has been zoned against apartments although characterized by apartments. If, from the evidence, we construct the vista which an observer, looking in a general northerly direction from the south side of Huguenot Park on Eastchester road, would have, it would be a vista the principal and particularly all of the incidents of which would be the park, the high school and the high class single-family developments on both sides of North avenue which have been mentioned. The Wykagyl Gardens, about 6,000 feet north of him, would not be visible. Such an observer would, indeed, see 2,000 feet north of him the Calton Court apartment, but no other apartments.

Summarizing and concluding, I find that the relevant zoning ordinance thus restricting the area in which plaintiff's property is located, tested in the light of the facts related to circumstances and locality (*Village of Euclid* v. *Ambler Realty Co., supra*) as of September 27, 1929, is reasonable and valid. I have not overlooked the circumstance that a declaration of its invalidity, as requested by the plaintiff, would or might be exceedingly beneficial to her and would result in a larger award to her from the county. That circumstance standing alone, however, is, of course, not sufficient to warrant such a judicial declaration.

Judgment is directed in favor of the defendants declaring the rights of the several parties to the action as above indicated, and dismissing the complaint upon the merits. The court exercises its

discretion as to costs by limiting each defendant to that defendant's taxable disbursements, which, only, are awarded against the plaintiff. Settle decision and judgment upon notice. I will pass upon the plaintiff's requests to find, already presented, upon such settlement; and will retain all papers pending such settlement.